Filed 8/11/26  In re B.W. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re B.W., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. J.W., Defendant and Appellant. | E087829 (Super.Ct.No. DPSW2500293) OPINION |

APPEAL from the Superior Court of Riverside County.  Sean P. Crandell, Judge.  Affirmed in part; reversed in part.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Jamila T. Purnell and Prabhath Shettigar, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant J.W. (Father) appeals the juvenile court's jurisdictional finding pursuant to Welfare and Institutions Code[1] section 300 with respect to his daughter, B.W. (Minor, born May 2017), and the court's exit order modifying Father's custodial time. Minor's mother, S.O. (Mother), is not a party to this appeal.

Father asserts that he had implemented changes to protect Minor prior to the jurisdictional hearing, thus there was no current risk of harm to Minor at the time of the hearing. Father also contends that the juvenile court erred in sustaining an allegation regarding emotional harm to Minor under section 300, subdivision (b). We affirm in part, and reverse in part.

## FACTUAL AND PROCEDURAL HISTORY[2]

Father's household consists of Father and Father's long-time girlfriend, A.T. (Girlfriend). Girlfriend shares custody of her three daughters: A.B. (age 11), K.B. (whose age is not listed in the record but who appears to be approximately the same age as Minor), and C.B. (age 6). Although Girlfriend and Father are not married, Girlfriend's daughters were sometimes referred to by the Riverside County Department of Public Social Services (DPSS) and the juvenile court as Minor's stepsiblings, and we occasionally do the same.

---

[1] All further statutory references are to the Welfare and Institutions Code unless specified otherwise.

[2] This appeal specifically pertains to Father and Minor, but there are a number of parents, stepparents, parental figures, half-siblings, and stepsiblings involved in Minor's life. For ease of reference, we have omitted reference to some of the family figures in Minor's life to focus only on those relevant to this appeal.

Mother's household consists of Mother and her husband, Cr.O. (Stepfather). Stepfather shares custody of his two children, including his daughter, C.O. (age 7; Stepsister). Mother shares custody of Minor's half-sister, L.E. (born April 2012; Half-sister), who is Mother's daughter with another individual.

Mother and Father litigated custody of Minor in family court in 2022. Included in Mother's custody request was a text message between her and Father wherein she expressed concern on November 12, 2021, that Minor said K.B. was licking her private parts, and Father responded: "[Minor] lies about everything cant [*sic*] tell the truth for just about anything so I don't believe that until I see it happen." The family court granted Mother and Father equal physical custody of Minor on a 2-2-5-5 schedule and joint legal custody.

On September 8, 2025, DPSS received a referral regarding Stepsister after she was diagnosed with having a contagious viral infection causing bumps on her genitals. Stepsister disclosed during an interview with DPSS that Minor, with whom she shared a bedroom in Mother's home, had touched her genitals.

Minor confirmed to DPSS that she had touched Stepsister's "private part" and that they put each other's hands in their pants, but claimed it was only on one occasion. Minor also stated that Girlfriend's daughter, K.B., had touched her inappropriately. She said this behavior started at Father's home with K.B., and that they would put their hands in each other's pants. Minor said the most recent time was a few weeks prior. A few days after DPSS's initial interview with Minor, she tested positive for the same virus as Stepsister.

Mother and Stepfather told DPSS during their first interview that they would put Stepsister and Minor into separate bedrooms and ensure that they would be supervised when together. Mother confirmed that Minor and K.B. had a history of touching each other inappropriately in their vaginal areas, and that Minor had another recent event with K.B. with inappropriate touching. Mother stated that she wanted to enroll Minor in therapy but that Father would not agree.

When DPSS interviewed Father, he acknowledged that Minor and K.B. had previously engaged in sexualized behaviors with each other but he was not aware of any recent incidents. He believed Minor learned inappropriate things from Half-sister while at Mother's home. Father stated that he wanted Minor and K.B. to have separate bedrooms and ongoing supervision in his home, but he did not think Minor needed therapy.

During Girlfriend's interview with DPSS, she said that K.B. denied engaging in any inappropriate behavior with Minor, but Minor recently asked K.B. if she wanted to engage in inappropriate behavior. She disclosed that Minor and K.B. had touched each other's vaginal areas three years ago, and that when she and Father learned of it they separated the girls and did not allow them to share a room for a year. They then assumed the concerns were mitigated, so Minor and K.B. were now sharing a bedroom again, along with C.B.

Girlfriend believed that Minor had contracted her virus from Stepsister, that Mother and Stepfather were neglectful and giving the children viral infections, and that Minor was learning sexual behaviors in Mother's home. Girlfriend said that she did not

4

agree to Minor and K.B. having separate bedrooms, because her eldest daughter, A.B., just got her own bedroom and she did not think it fair to punish her children "[j]ust because [Minor] does stupid things." When the DPSS social worker pointed out that K.B. was also engaging in inappropriate behaviors, Girlfriend said K.B. is not, and it is just Minor trying to initiate.

A few weeks later, on September 22, 2025, Mother reported to DPSS concerns that Minor was sleeping on a mattress on the floor in the dining room at Father's house. Mother also said she spoke to Father again about therapy for Minor, and Father told her he believed Minor was learning the behavior from Half-sister and he had no concerns in his household so he was not agreeing to therapy.

DPSS confirmed with Girlfriend that Minor, K.B., and C.B. were switching off sleeping locations, with Minor sleeping in the living room while her children slept in the bedroom, and vice versa. Girlfriend expressed frustration with the sleeping arrangements, stating that she felt it was unfair if, for example, she had to supervise the children while they have a slumber party and she would therefore not be able to sleep in her own bed. She questioned how long the arrangement would have to continue, and when the social worker stated that there would need to be ongoing supervision, Girlfriend expressed frustration that it was going to be " 'forever' " and commented, "she guesses this is her new life now."

Girlfriend requested that Minor be interviewed by DPSS again because, according to Girlfriend, Minor admitted she lied about the allegations and had learned the behaviors from Half-sister. The DPSS social worker stated to Girlfriend that regardless of where

5

Minor learned the behavior, it was occurring in Girlfriend and Father's home, so ongoing supervision of the children was necessary, to which Girlfriend stated it was an inconvenience and "CPS" was not going to buy her a new home to separate the children.

Father also confirmed with DPSS that Minor was switching off sleeping locations, sleeping in the bedroom by herself on the weekends and in the living room by herself on weekdays. Father expressed that he did not understand why they must do this in their household when the behavior started in Mother's household, and that the issue was in Mother's household, not his. Father said Minor told him she lied to "CPS" and the behavior started in Mother's home. Father did agree at this time to enroll Minor in therapy.

On September 29, 2025, DPSS filed a joint petition pursuant to section 300 for Half-sister and Minor[3] With respect to Minor, the petition alleged pursuant to section 300, subdivision (b)(1), that Father demonstrated a limited ability to protect Minor because he allowed her to sleep in the same room as her stepsiblings despite having knowledge of the children having sexualized behaviors towards one another (allegation b-1), and that both parents knew or reasonably should have known that the children were engaging in sexualized behaviors with stepsiblings while in their care but failed to intervene and protect the children (allegation b-2).

In October 2025, Half-sister confirmed to DPSS that Minor and Stepsister were no longer sharing a bedroom in Mother's home and that they were always supervised when

---

[3] Although DPSS filed a joint petition for the children, Half-sister is not a subject of this appeal.

6

together. Minor told DPSS that she and Stepsister were always supervised in Mother's home when they played together, but that she was not always supervised in Father's home when playing with K.B. and C.B. She stated that K.B. and C.B. are mean to her, but that she has not had any further inappropriate interactions with Stepsister, K.B., or C.B. Minor stated that she did not feel safe in Father's home, and Girlfriend sometimes " 'Bops' " her on the head.

As set forth in the October 2025 addendum report, K.B. stated to DPSS that Minor had not touched her inappropriately, that when they play together they cannot have their door shut, and that Girlfriend supervises them from the couch in the living room or puts a camera in their room to watch them. K.B. also disclosed that Minor has her own cups and plates in Father's home, that Minor did not get as many presents as the other children in Father's home (i.e., Minor received only pajamas while the other children received pajamas and toys) because she is in trouble and " '[i]t is mainly [Minor] that has been doing everything.' "

A.B. disclosed to DPSS that when the family has movie nights at Father's house, Minor goes to her room by herself while the rest of them are in the living room, which is meant as a punishment for Minor's behavior. A.B. confirmed that she and her siblings received a variety of toys as gifts while Minor only received pajamas, that Girlfriend does monitor Minor when she plays with the other children, and that Minor has her own utensils in Father's home because, according to Girlfriend, her saliva is contagious.

Father and Girlfriend wanted Minor to be interviewed again because they claimed Minor disclosed more sexual behavior between Minor and Stepsister while Minor was in

Mother's care. Girlfriend asked if she could pay $250 to have Minor put through a lie detector test. When the DPSS social worker informed Father and Girlfriend that Minor had already been through multiple interviews, including a forensic interview, and that a lie detector test was inappropriate for a child, Girlfriend expressed frustration and Father stated that he thought Mother was coaching Minor not to say anything.

At the initial hearing on October 14, 2025, the juvenile court found that there was a prima facie showing that Minor and Half-sister were subject to section 300, and both children were ordered to remain in the custody of their parents.

As set forth in the November 2025 jurisdiction/disposition report (J/D Report), Minor stated that she had to sleep on the floor in the living room and none of Girlfriend's children had to sleep on the floor. Minor reported that Father would treat her differently when Girlfriend's children were around and would yell at her, that Girlfriend's children would make fun of her, and that Girlfriend would not speak to her since the DPSS investigation began. Minor also informed DPSS that she had to take a shower outside at Father's home naked, because Girlfriend's children were inside and she was not allowed to be around them. Father confirmed that this happened on one occasion but showed the social worker that although there were no walls around the shower, it was positioned where no neighbors could see it. Minor also stated that Father told her that Mother was putting thoughts into her head and trying to get her to lie, which Minor said was not true.

The J/D Report documented that Father and Girlfriend had changed custody schedules so that Minor would not be in Father's home at the same time as Girlfriend's children. Although not stated expressly, it seems Girlfriend's children were also subject

8

to a dependency action, which was referenced in this case's court proceedings as a companion case, and which led to the change in Girlfriend's custody schedule with her children to keep them separated from Minor.

DPSS noted its concerns in the J/D Report that Father and Girlfriend were overly focused on where the inappropriate touching was learned and not taking accountability for what happened in their home. Father continued to believe Half-sister was exposing Minor to inappropriate content. Father questioned whether the current custody arrangement was going to have to remain in place forever, and expressed confusion because Minor had contracted a communicable disease from Stepsister but Mother was permitted to have custody of Stepsister and Minor at the same time. Father and Girlfriend asked for clarification on why the children's rooms needed to be changed, since the sexual conduct did not occur at night. According to the J/D Report, Father and Girlfriend seemed to feel the whole situation was an inconvenience.

Mother was described in the J/D Report as appearing cooperative. Mother, Half-sister, and Stepfather all expressed concerns for Minor while in Father's care and felt that Father and Girlfriend were treating Minor poorly.

The J/D Report set forth DPSS's recommendation that Minor be declared a dependent child and that the parents receive family maintenance services.

At the November 17, 2025, jurisdiction/disposition hearing, Mother's counsel noted that an order was made in the companion case that the minors (presumably Girlfriend's children and Minor) were not to be around one another at any time, and alleged that Father had made at least one attempt to thwart that order. The juvenile court

ordered that its "prior order" to restrict the minors being in contact with one another "is to remain in full force and effect" and that the parents were to make efforts to comply with that order.[4]  The jurisdiction/disposition hearing was continued so that it could be heard concurrently with the companion case.

As set forth in the December 2025 addendum report, on November 17, 2025, DPSS received a message that Girlfriend requested custody of her children during a time period that overlapped with Father's custodial time with Minor.[5]  When contacted by DPSS, Girlfriend seemed upset and said the overlap was only for two days, that she and Father were doing everything they could to ensure the children did not interact with one another, and that Father and Minor were going to be on vacation while she and her children would be at the family home.  Father stated that he was taking Minor camping and that he understood there should be no crossover with Girlfriend's children.  When asked a few weeks later, Minor initially stated that she had not been camping with Father recently, but then stated they had gone camping at a lake in Arizona and that she had not seen Girlfriend's children other than at school.

In its December 2025 addendum report, DPSS changed its recommendation to Mother being granted sole legal and physical custody of Minor, with Father having

---

[4]  The juvenile court had not made a prior order in Minor's case to keep Minor separated from Girlfriend's children, so it appears the court was referencing the order that was made in the companion case.

[5]  Based on the timing and the lack of any other events in the record that would fit the description, this appears to be the attempt to thwart the juvenile court's order referred to by Mother's counsel at the November 17, 2025, jurisdiction/disposition hearing.

visitation every other weekend with visits not taking place on the same weekends that Girlfriend had custody of her children.

Per the December 2025 addendum report, Minor stated that Girlfriend was now sometimes nice to her but was still continuing to ignore her for the majority of her visits with Father. DPSS conducted a home assessment and confirmed that at Mother's house Minor had her own bedroom downstairs and the other children's bedrooms were upstairs. Mother and Stepfather reported that Minor was angry when returning from Father's custody and was emotional before going to Father's home, making statements such as " 'I can do it for two days.' "

In the December 2025 addendum report, DPSS expressed concerns about Minor while in Father's care, with significant blame placed on an eight-year-old child and Girlfriend not treating Minor well. Per DPSS, Father and Girlfriend "do not seem to understand that we are no longer concerned about the actual incident that occurred, but how we are going to prevent it from happening in the future."

On December 15, 2025, the jurisdiction and disposition hearing was continued again in light of DPSS changing its recommendation.

As set forth in the February 2026 addendum report, Minor stated that Girlfriend was not nice to her and called her the "N-word." Minor noted there were some days over the holidays when she was supposed to go to Father's house but did not, and she was not sure why. Mother reported that Father had given up several custodial days over the holidays so that Girlfriend could spend time with her children, and had declined offers

11

from Mother to have Minor dropped off in the evening for a few days when she knew Girlfriend's children were not going to be present.

On February 3, 2026, DPSS filed an amended petition pursuant to section 300. Added to allegation b-1 was the following sentence: "In addition, [Father] failed to follow court orders and continued to allow ongoing contact between the child, [Minor] and his girlfriend's children, A.B., K.B. and C.B." Allegation b-2 was revised to allege that only Father (rather than both parents) knew or should have known that Minor was engaging in sexualized behaviors with her stepsiblings and failed to intervene or protect her. A new allegation b-3 was added, stating that Father "neglects the health, safety and well-being of the child … in that the child disclosed the father is treating her differently and making her shower outside naked in which it made her feel upset. Furthermore, the father requires [Minor] to utilize different eating utensils than the rest of the family 'so they don't get what she has;' such conditions place [Minor] at risk of ongoing emotional harm." The box on the petition form was checked for section 300, subdivision (b)(1), and no other subdivision boxes were checked.

At the February 3, 2025, jurisdiction and disposition hearing, Father's counsel argued that the incident underpinning allegations b-1 and b-2 at that point was five months old and had been addressed, so there was no current risk of harm to Minor, and the allegations about the outside shower and separate utensils were taken out of context. Minor's counsel confirmed that Minor felt the separate dishes were not for safety reasons but instead meant as a punishment. Minor also confirmed to Minor's counsel that Girlfriend called her the " 'N' word."

The juvenile court found all three allegations in the amended petition true and sustained the petition. It issued family court exit orders granting Mother and Father joint legal and physical custody of Minor, with Father having custodial time every other weekend and Girlfriend and her children not to be present during Father's time with Minor. Mother's counsel was ordered to prepare the custody orders, and the dependency action was ordered terminated upon the custody orders being filed.

## DISCUSSION

A.  ALLEGATIONS B-1 AND B-2

Father contends that the juvenile court erred in finding that Minor faced a substantial risk of harm pursuant to allegations b-1 and b-2 because he had addressed the situation and thus there was no current risk of harm at the time of the jurisdictional hearing.

In order for the juvenile court to find that a child comes within its jurisdiction pursuant to section 300, subdivision (b), the following elements must be established: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) There must be a risk to the child at the time of the jurisdictional hearing in order to meet the last element, " 'some reason to believe the acts may continue in the future.' " (*Id.* at p. 824.)

We review the juvenile court's jurisdictional findings to see if substantial evidence supports them, and we draw all reasonable inferences from the evidence to support the juvenile court's findings and orders. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) If substantial

13

evidence supports the findings and orders, "we affirm the order even if other evidence supports a contrary conclusion." (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

The evidence reflects that Minor engaged in sexualized behavior with K.B. potentially as far back as 2021 per Mother's text messages to Father that were attached to her custody request. Father's response at the time was to dismiss Mother's concerns and say that Minor "lies about everything." Even if Father was right about Minor lying in 2021 (although subsequent events evidence she was not lying), Father and Girlfriend admitted to DPSS that sexual contact took place between Minor and K.B. three years prior to the most recent incident. Father and Girlfriend had previously placed Minor and K.B. into separate bedrooms to address the behavior, but then, after a year, switched back to the two girls sharing a room along with K.B.'s younger sister, C.B. Father refused to allow Minor to participate in therapy, as Mother requested, until DPSS became involved and persuaded Father.

Throughout the DPSS investigation, Father and Girlfriend complained about it being an inconvenience to keep Minor separated from Girlfriend's children and questioned whether this separation needed to continue long-term. They also questioned why Minor needed to be in a separate bedroom from K.B. in the first place if the behavior took place in Mother's home and did not happen at night. They focused most of their attention on punishing Minor while in their home and placing blame on Minor or other children in Mother's household. They pushed for Minor to be reinterviewed and subjected to a lie detector test, and Father told Minor that Mother was putting ideas into her head.

The change in Girlfriend's custodial time with her children to keep them separated from Minor took place just a few months prior to the jurisdictional hearing, and appears to have been a result of the companion dependency case rather than voluntary action on Father or Girlfriend's part. During those few months, Father had already attempted at least once to thwart the order and have custody of Minor while Girlfriend's children were in her custody.

Based upon the foregoing, the juvenile court could reasonably find that the custody schedule that kept Minor separated from Girlfriend's children was in place for a short period of time relative to the years over which Minor's inappropriate behavior with K.B. took place, and there was at least one instance of Father attempting to thwart the orders in that short time span. The court could reasonably conclude that Father was at risk of backsliding and permitting Minor to be in the presence of Girlfriend's children in light of the fact that Father and Girlfriend were vocally unhappy throughout the proceedings about having to rearrange their lives long term, repeatedly questioned the need to separate the children, and seemed to believe that Minor's behavior was only an issue in Mother's home. In fact, Father and Girlfriend had on a previous occasion placed Minor and K.B. back into a shared bedroom after they believed the issue had been resolved. Substantial evidence accordingly supports the juvenile court's finding that the circumstances at the time of the jurisdictional hearing exposed Minor to substantial risk of harm.

The cases cited by Father, all of which discuss the need for current risk to Minor to support a jurisdictional finding, do not assist him. They involve one-off incidents with no evidence of an ongoing problem or incidents that took place many years before the involvement of the juvenile court. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025-2026 [car accident while father was driving under the influence was a "single episode of endangering conduct" and no evidence either parent had a substance abuse problem]; *In re R.L.* (2025) 115 Cal.App.5th 221, 233 [car accident while father was driving under the influence was a one-time incident and no evidence that either parent had a history of alcohol abuse]; *In re M.W.* (2015) 238 Cal.App.4th 1444, 1454 ["the record contains evidence that a single incident of domestic violence occurred more than seven years before the hearing"]; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [physical violence by father against mother took place two or seven years before the petition was filed].)

The instant case is clearly distinguishable. The juvenile court's jurisdictional finding was not premised on a one-time incident from many years ago. Instead, the concerning behavior between Minor and her stepsiblings occurred repeatedly over the course of three or four years and had recurred just a few weeks prior to DPSS initiating its investigation. As discussed *ante*, the changes to the custody schedule to keep Minor separated from Girlfriend's children commenced only a few months prior to the jurisdictional hearing. There is substantial evidence to support the juvenile court's finding of current risk of harm to Minor at the time of the jurisdictional hearing.

16

B.    ALLEGATION B-3

With respect to Father's claim that allegation b-3 was erroneous as pleaded because it alleged a risk of emotional harm rather than physical harm to Minor, we agree.

Section 300, subdivision (b)(1), the statute under which allegation b-3 was pleaded, provides in relevant part that a child is within the jurisdiction of the juvenile court where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of ...  [¶]  …[t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child."

In comparison, subdivision (c) of section 300 provides in relevant part that a child is within the juvenile court's jurisdiction where "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent."

Although Father and Girlfriend's conduct toward Minor—including forcing her to use a separate set of dishes and utensils from the rest of the family, calling her the "N-word," making her shower naked outside, isolating her from family events, giving her inferior gifts compared to the other children, ignoring her, and generally treating her poorly—is highly concerning and could have potentially formed a basis for dependency jurisdiction pursuant to section 300, subdivision (c), or alternatively modification of the custody schedule in family court, it does not fall under the conduct contemplated by section 300, subdivision (b).  There is no physical harm or risk of physical harm to Minor resulting from the conduct described in allegation b-3; thus, there is insufficient evidence

17

to support the court's finding as pleaded.  We therefore reverse the juvenile court's findings as to allegation b-3.

To be clear, our reversal of the allegation b-3 findings is not a basis for reversal of the juvenile court's jurisdictional finding, because we have affirmed the court's findings on allegations b-1 and b-2.  "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence."  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

## C.  CUSTODY ORDERS

Father challenges the juvenile court's custody orders with a single, conclusory sentence, alleging that "because there is no substantial evidence to support any of the section 300(b) counts, and thus no longer any safety concerns in [Father's] home, there was no need to alter the time share arrangement between [Father] and [Mother] prior to the initiation of this case."  Father provides no authority in support of this statement.

" '[A]n appealed judgment is presumed correct, and appellant bears the burden of overcoming the presumption of correctness.'  [Citation.]....  When an appellant raises an issue 'but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' "  (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1207.)  Father has waived any challenge to the juvenile court's custody orders.

18

## DISPOSITION

The juvenile court's jurisdictional finding under Welfare and Institutions Code section 300, subdivision (b), allegation b-3 is reversed.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

CODRINGTON

J.